# United States Court of Appeals
## For the First Circuit

Nos. 14-1582
     14-1631
     14-1715
     17-1317
     17-1729


UNITED STATES OF AMERICA,

Appellee,

v.

LUIS D. RIVERA-CARRASQUILLO, a/k/a Danny KX, a/k/a Danny Vorki;
EDWIN BERNARD ASTACIO-ESPINO, a/k/a Bernard, a/k/a Bernal;
RAMÓN LANZA-VÁZQUEZ, a/k/a Ramoncito,

Defendants, Appellants.

———————————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]
[Hon. Aida M. Delgado-Colón, U.S. District Judge]

———————————


Before

Howard, Chief Judge,
Thompson and Barron, Circuit Judges.

———————————


Peter Goldberger for the consolidated appellants and on brief, with Pamela A. Wilk, for appellant Luis D. Rivera-Carrasquillo.
Inga L. Parsons for the consolidated appellants and on brief for appellant Ramón Lanza-Vázquez.

Mariem J. Paez on brief for appellant Edwin Bernard Astacio-Espino.

Victor O. Acevedo-Hernández, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, and Francisco A. Besosa-Martínez, Assistant United States Attorney, were on brief, for appellee.

---

August 2, 2019

---

**THOMPSON**, **Circuit Judge**.

**Overview**

For many years, a vicious gang called "La ONU" committed unspeakably brutal crimes in Puerto Rico, raking in millions of dollars from drug sales and killing anyone (and we mean *anyone*) in its way — police officers, defectors, rivals in the "La Rompe ONU" gang, you name it.[1] Law enforcement eventually took La ONU down, however. And a federal grand jury criminally indicted scores of its members, including appellants Astacio-Espino, Lanza-Vázquez, and Rivera-Carasquillo (their full names and aliases appear in our case caption).[2] A bone-chilling read, the superseding indictment (the operative indictment in this case) accused each of these three gangbangers of doing some or all of the following:

- conspiring to violate the Racketeer Influenced and Corrupt Organizations Act, see 18 U.S.C. 1961(d) — familiarly called the RICO conspiracy statute;

- aiding and abetting violent crimes in aid of racketeering, namely murder or attempted murder under Puerto Rico law, see 18 U.S.C. 1959(a) — commonly called the VICAR statute;

---

[1] For the backstory on how La ONU and La Rompe ONU came to be, check out United States v. Ramírez-Rivera, 800 F.3d 1, 12-13 (1st Cir. 2015). And as we did there, from now on we will refer to La Rompe ONU as "La Rompe."

[2] We will sometimes refer to them collectively as "our appellants" or just "appellants."

- aiding and abetting the use and carrying of firearms during VICAR murders, see 18 U.S.C. §§ 924(c)(1)(A), 924(j)(1) and (2);

- knowingly transferring a firearm for use during VICAR murders, see 18 U.S.C. § 924(h);

- conspiring to engage in drug trafficking, see 18 U.S.C. §§ 846, 860; and

- conspiring to possess firearms during drug-trafficking crimes, see 18 U.S.C. § 924(o).

After Astacio-Espino moved unsuccessfully to suppress material seized by the government, the case went to trial. And the evidence there painted a damning picture of what the trio did with La ONU, as a sampling makes clear.

A drug-point owner and enforcer (an enforcer hunts down and kills "the enemy," by the way), Astacio-Espino helped murder a police officer and a La Rompe member known as "Pekeke" (whose real name was Christian Toledo-Sánchez).[3] Lanza-Vázquez also was a drug-point owner and enforcer. Along with other La ONU members, he helped kill someone thought to be a "squeal[er]." Rivera-Carasquillo was not just a drug-point owner and enforcer. He was a leader too. He also participated in Pekeke's slaying. And he

---

[3] The nickname is variously spelled in the record. We adopt the spelling employed in the parties' briefs.

helped murder someone accused of shooting at a La ONU leader as the leader drove through a La Rompe-allied area. Rivera-Carasquillo choked him while others from La ONU stomped on his chest until he died. To send a message, apparently, Rivera-Carasquillo (according to a cooperating witness) "went at" the person "with [an] AK [rifle] and just removed his face" — *i.e.*, Rivera-Carasquillo "[e]rased his face."

Taking everything in — testimony from cooperating coconspirators, law-enforcement officials, and forensic-science experts; autopsy and crime-scene photos; physical evidence in the form of seized guns, ammo, and drugs, *etc.* — the jury found Astacio-Espino, Lanza-Vázquez, and Rivera-Carasquillo guilty as charged. And the district judge imposed a number of sentences on them, including life sentences (because they do not contest their sentences, we need say no more about that subject).

Hoping to score a new trial, Astacio-Espino, Lanza-Vázquez, and Rivera-Carasquillo later filed two post-trial motions — one claiming that a partial closure of the courtroom during jury selection constituted "plain, reversible error," and the other alleging that a cooperating witness in a related case had given a different account of Pekeke's murder. But they had no success.[4]

---

[4] So far as relevant here, two district judges had roles in today's case: Judge José Antonio Fusté, now retired, handled everything except the new-trial activity, which then-Chief Judge

- 5 -

Now before us, Astacio-Espino, Lanza-Vázquez, and Rivera-Carasquillo press a variety of claims. We tackle the claims one by one below, highlighting only those facts needed to put things in perspective. But for those who want our conclusion up front: after slogging through the issues, we *affirm* the contested convictions.[5]

## Suppression Claim

*Background*

Astacio-Espino moved pretrial to suppress a cache of guns and drugs seized during the warrantless search of a house (and the SUV garaged there) belonging to Ismael E. Cruz-Ramos — a person indicted with our appellants but whose trial was before a different district judge: Judge William E. Smith (of the District of Rhode Island, sitting by designation), rather than Judge Fusté.

---

Aida M. Delgado-Colón took care of after Judge Fusté left the bench.

[5] Appellants try to adopt each other's arguments — something they can do if they "connect the arguments adopted with the specific facts pertaining" to them. See United States v. Bennett, 75 F.3d 40, 49 (1st Cir. 1996) (discussing Fed. R. App. P. 28(i)); see also United States v. David, 940 F.2d 722, 737 (1st Cir. 1991) (noting that arguments adopted by reference "must be readily transferrable from the proponent's case to the adopter's case"). The government thinks none of them has sufficiently shown that he is in the same factual or legal boat as the proponent of each issue. But because the arguments raised are not winning ones, we will assume without deciding that each appellant effectively joined in the issues that relate to his situation. See Ramírez-Rivera, 800 F.3d at 11 n.1 (taking a similar tack).

Cruz-Ramos had moved earlier to suppress the same evidence taken during the same search. And Judge Smith gave him a split decision, suppressing (for reasons not relevant here) some items (rifles) but not others (handguns and drugs). Convinced that he had "standing" to challenge the search as an "overnight guest" of Cruz-Ramos, Astacio-Espino asked Judge Fusté to suppress everything.[6] To back up his overnight-guest claim, Astacio-Espino relied heavily on an untranslated Spanish-language declaration by Cruz-Ramos. The next day, Judge Fusté entered an electronic order stating that he was "respecting Judge Smith's ruling on these issues" — though a day later he clarified that he would "not extend[]" his colleague's edict "to parties without standing" and that he would "decide the same in the context of trial." When trial came, Judge Fusté ended up "respect[ing]" Judge Smith's order. So Judge Fusté suppressed the rifles, but not the handguns or the drugs — though without explaining why he thought Astacio-Espino had standing, even though the government seemingly sought one.

_____

[6] Lawyers and judges occasionally use the word "standing" in search cases, not in the Article III sense but as a shorthand reference in discussing whether a defendant claiming a Fourth Amendment right has a personal interest that the search infringed (more on the personal-interest stuff in a moment). See United States v. Bain, 874 F.3d 1, 13 (1st Cir. 2017); United States v. Kimball, 25 F.3d 1, 5 n.1 (1st Cir. 1994).

*Arguments and Analysis*

Seeking to undo what Judge Fusté did, Astacio-Espino pins his hopes on a straightforward theory. Fairly recently, he notes, a panel of this court partially reversed Judge Smith's suppression ruling in Cruz-Ramos's case. See Ramírez-Rivera, 800 F.3d at 27-33 (holding that the police lacked probable cause for the search and that neither the good-faith exception to exclusionary rule nor the harmless-error doctrine applied). Proclaiming himself "an overnight guest at [Cruz-Ramos's] residence," he insists we should reverse Judge Fusté's suppression decision too, since Judge Fusté simply adopted Judge Smith's now-discredited ruling. Not to be outmaneuvered, the government identifies three supposed bases for affirming Judge Fusté's ruling: Astacio-Espino's failure to argue in his opening brief that he had a legitimate expectation of privacy sufficient to show standing to contest the search; Astacio-Espino's reliance on the untranslated Spanish-language document to establish his status as an overnight guest at Cruz-Ramos's house; and the harmlessness of any error (if error there was) on Judge Fusté's part, given the overwhelming evidence of Astacio-Espino's guilt.

Reviewing the issue afresh ("*de novo*," in law-speak), see United States v. Orth, 873 F.3d 349, 353 (1st Cir. 2017) — knowing too that we can affirm on *any basis* supported by the

- 8 -

record, see United States v. Arnott, 758 F.3d 40, 43 (1st Cir. 2014) — we think the government has the better of the argument.

Fourth Amendment rights are *personal* ones.  See, e.g., Rakas v. Illinois, 439 U.S. 128, 133 (1978).  So a criminal defendant wishing to challenge a search must prove that he had "a legitimate expectation of privacy" in the searched area, id. at 143 — *i.e.*, he must show that he "exhibited an actual, subjective, expectation of privacy" and that this "subjective expectation is one that society is prepared to recognize as objectively reasonable," United States v. Rheault, 561 F.3d 55, 59 (1st Cir. 2009); see also United States v. Werra, 638 F.3d 326, 331 (1st Cir. 2011).  An overnight guest generally has a reasonable expectation of privacy in his host's home.  See, e.g., United States v. Almonte-Báez, 857 F.3d 27, 32 n.4 (1st Cir. 2017) (citing Minnesota v. Olson, 495 U.S. 91, 96-97 (1990)).  The problem for Astacio-Espino is that he supported his overnight-guest claim with a Spanish-only declaration — a problem, because judges cannot consider untranslated documents.  See, e.g., United States v. Quiñones-Otero, 869 F.3d 49, 53 (1st Cir. 2017) (citing the Jones Act, 48 U.S.C. § 864; González-de-Blasini v. Family Dep't, 377 F.3d 81, 88 (1st Cir. 2004); and Dávila v. Corporación de Puerto

Rico Para La Difusión Pública, 498 F.3d 9, 13 (1st Cir. 2007)).[7]
And this evidentiary gap devastates his suppression argument,
because "a failure to present evidence" on the "reasonable privacy"
front "prevents a defendant from making a claim for suppression
under the Fourth Amendment."  See United States v. Samboy, 433
F.3d 154, 161-62 (1st Cir. 2005).[8]

## Anonymous-Jury Claim

Astacio-Espino, Lanza-Vázquez, and Rivera-Carasquillo
criticize the judge for empaneling an anonymous jury.  But they
concede that Ramírez-Rivera — a decision disposing of appeals
brought by some of their coindictees — forecloses their argument,
and they raise the point only to preserve the issue "for future
consideration."  Enough said about that, then.

## Partial-Courtroom-Closure Claim

### Background

While their appeals were pending, Astacio-Espino, Lanza-
Vázquez, and Rivera-Carasquillo jointly moved the district judge

---

[7] Astacio-Espino says in his reply brief that materials he
has not given us — FBI interview memos (known as "302" reports)
and the statement of facts in Cruz-Ramos's plea agreement — confirm
he stayed over Cruz-Ramos's house several times.  This does not
help him, however, because an appellant waives any argument not
made in his "opening brief but raised only in [his] reply brief."
Lawless v. Steward Health Care Sys., LLC, 894 F.3d 9, 25 (1st Cir.
2018).

[8] We thus need not address the government's other arguments
for affirming the judge's suppression ruling.

to supplement the record on appeal, arguing that a post-trial investigation by counsel revealed that "official personnel" had kept some of appellants' friends and family from attending jury selection.  See Fed. R. App. P. 10(e)(2); see also United States v. Pagán-Ferrer, 736 F.3d 573, 581-84 (1st Cir. 2013) (discussing Fed. R. App. 10(e)).  And they asked the judge to hold a hearing and make findings of fact on the matter.

After some procedural wrangling not relevant here, the judge decided to hold an evidentiary hearing.  Pertinently for our purposes, appellants called six witnesses:  Astacio-Espino's mother (Francisca Espino); Lanza-Vázquez's former girlfriend (Betzaida Caballero-Ortiz); Rivera-Carrasquillo's father (Héctor Rivera-Rosa), mother (Maribel Carrasquillo), and trial counsel (José Aguayo); and Lanza-Vázquez's and Rivera-Carrasquillo's friend (Juan Carlos Ramos-Piñeiro).  The government, for its part, called two witnesses:  a former court security officer (Héctor Villavicencio) and a courtroom deputy clerk (Ana Romero), both of whom had been assigned to the courtroom for jury selection in appellants' case.

Reduced to bare essence, appellants' witnesses testified that when the courtroom opened around 9:00 a.m., a man stationed at the door — thought by some to be a United States marshal — said that only one family member per defendant could go in (Lanza-

- 11 -

Vázquez's ex-girlfriend testified that the man told her only potential jurors could go in). No prospective jurors were in the courtroom when this happened. And none of the witnesses could give a good physical description of the man.

As for the government's witnesses, the court security officer pertinently testified that he got to the courtroom at 9:00 a.m. on the day of jury selection, opened the doors, and did not stop anyone from coming in. Asked whether he "at any time [told] anyone that they could not come in," he replied "no." He added that the judge handling jury selection (Judge Fusté) had always instructed him to let the public in. He also noted that he only left the door when he had to hand prospective jurors papers or a microphone (potential jurors used the mic in responding to questions asked during voir dire — a process that allows counsel and the judge to see if there are grounds to challenge a possible juror, for example). And the courtroom deputy relevantly testified that once the judge excused a potential juror, the excused person would leave through the courtroom's front door. She also said that she saw members of the public sitting in benches reserved for them. And asked whether "it ever appear[ed]" that the benches were "so full that no one else could be there," she answered "no."

In a post-hearing rescript, the judge found that each of the "family/friend witnesses had much to gain by alleging that

they were prevented from entering the courtroom," given how their loved ones faced spending the rest of their lives behind bars. Noting that two years had passed before the witnesses alleged a man had restricted access to the courtroom and that none of them could give a physical description of the man, the judge found it "difficult to consider their testimony credible." But the judge had no difficulty crediting the court security officer's testimony about opening the courtroom around 9 a.m. and not stopping anyone from entering. And "[h]aving been present during jury voir dire," which put him "in the best position to determine the credibility" of the testifying witnesses, the judge found "that the courtroom was not closed, neither partially nor fully and neither expressly nor impliedly, during the jury voir dire" in this case.

*Arguments and Analysis*

Astacio-Espino, Lanza-Vázquez, and Rivera-Carasquillo believe the record shows that a partial courtroom closure occurred, which, they continue, violated two constitutional provisions: Article III, by delegating the closure decision to a non-judicial officer; and the Sixth Amendment, by depriving them of their right to a public trial. The government's principal response is that the judge committed no clear error in finding no courtroom closure here. We side with the government.

- 13 -

Appellants and the government — who agree on little else — agree that we must give clear-error review to the judge's no-courtroom-closure finding and plain-error review to appellants' unpreserved legal arguments. See United States v. Negrón-Sostre, 790 F.3d 295, 301 (1st Cir. 2015) (applying those standards in a similar situation). We begin and end with the judge's no-courtroom-closure finding, knowing that winning a clear-error challenge is no easy thing because the challenger must show that the contested finding stinks like "a 5 week old, unrefrigerated, dead fish." See Toye v. O'Donnell (In re O'Donnell), 728 F.3d 41, 46 (1st Cir. 2013) (quoting S Indus., Inc. v. Centra 2000, Inc., 249 F.3d 625, 627 (7th Cir. 2001)). Put less colorfully, the challenger must do more than show that the finding is "*probably* wrong*," for we can reverse on clear-error grounds only if — after whole-record review — we have "a strong, *unyielding* belief" that the judge stumbled. See id. (emphasis added) (quoting Islamic Inv. Co. of the Gulf (Bah.) Ltd. v. Harper (In re Grand Jury Investigation), 545 F.3d 21, 24 (1st Cir. 2008)).

Appellants' clear-error argument turns entirely on their claim that the judge should have believed their witnesses over the government's. As an example, they contend that the "demeanor" of their witnesses "was thoughtful and unemotional." And they insist that the testimony of the government's witnesses "did not refute

the family members' consistent testimony" that a "courtroom official" told them "that only one member of each defendant's family could enter the courtroom for jury selection." By basically focusing on the witnesses' credibility, they make their job "particularly" challenging, because — unlike us — the judge heard the witnesses from both sides and eyed their manner. See United States v. Guzmán-Batista, 783 F.3d 930, 937 (1st Cir. 2015). If, as here, a judge's finding is based on witness credibility, that finding, "if not internally inconsistent, can *virtually never be clear error*." See Anderson v. City of Bessemer, 470 U.S. 564, 575 (1985) (emphasis added). And we see nothing "[in]coherent and facially [im]plausible" about the government witnesses' account. See id.

Still trying to turn defeat into victory, appellants protest that the testimony of the government's witnesses "left open the distinct possibility that it was a [deputy United States marshal] inside the courtroom and near the courtroom door who told the defense witnesses exactly what they said they were told when they tried to enter." Here is the problem with that theory. The defense's witnesses testified that an official-looking man told them about the one-family-member-per-defendant policy when the courtroom doors opened at 9:00 a.m., when no prospective jurors were there. During that key period — between the opening of the

doors and the seating of potential jurors — the only person manning the door was the court security officer, who said he stopped *no one* from going in.  Or so the court security officer testified, which the judge was entitled to credit.  And under clear-error review, "[a] finding that is 'plausible' in light of the full record — *even if another is equally or more so* — must govern." Cooper v. Harris, 137 S. Ct. 1455, 1465 (2017) (emphasis added).

So we are in no position to disturb the judge's no-courtroom-closure finding — a conclusion that defeats appellants' challenge and makes it unnecessary to consider the parties' remaining arguments on this front.

### Berating-Counsel Claim

Echoing an unsuccessful mistrial motion filed below, Astacio-Espino, Lanza-Vázquez, and Rivera-Carasquillo complain that the judge berated counsel in front of the jury, diminishing the jury's respect for the defense's work.  Lanza-Vázquez's and Rivera-Carasquillo's immediate problem is that while Astacio-Espino's counsel made the mistrial motion, their counsel specifically chose *not* to join that motion — thus waiving appellate consideration of their argument.  See generally United States v. Olano, 507 U.S. 725, 733 (1993) (noting that "waiver is the intentional relinquishment or abandonment of a known right" (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938))).

And even if we were willing to overlook this waiver (which we are not), they and Astacio-Espino spotlight no specific instances where the judge dressed counsel down. As the government notes, our appellants simply claim that the judge instructed the jurors that "if you have noticed that I have become upset about something with either side or somebody, do not [hold] it against that person, lawyer or party." Context is everything, of course. And because appellants do not say what the allegedly biased comments were, we cannot assess whether he acted defensibly, without judicial bias. See United States v. Rodríguez-Rivera, 473 F.3d 21, 28 (1st Cir. 2007) (discussing how we go about evaluating a claim of judicial bias). Knowing that it is not our job to do the parties' homework for them, we find the argument waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (noting that "[i]t is not enough" for parties "merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work," and emphasizing "that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

**Intervening-with-Witnesses Claim**

*Background*

Appellants also accuse the judge of improperly questioning the witnesses. Here is what you need to know about that claim.

Testifying about the erase-the-face episode (the one we mentioned above), a cooperating witness said that the victim begged his tormentors not to "remove" his face. "Erase his face," the judge stated. "Erase his face," the witness said. The cooperating witness also noted that before he and his cohorts stomped the victim to death, one of them "removed the bullets" from a "magnum" and "put the magnum to [the victim's] head." "Pulled the trigger," the judge said. "Pulled the trigger," the witness responded. "As if he was going to kill him," the judge added. "I think I already said that," the witness said, "[b]ut as if he was going to kill him." Shifting to a different murder, the cooperating witness explained how, after the victim got shot and fell to the ground, one of the shooters "emptied his gun at [the victim]." "At his face," said the judge. "At his face," said the witness.

A former homicide detective testified about seeing a body at a crime scene that "no longer had a face." A couple of questions later, the prosecutor asked, "And you mentioned that this individual . . . did not have face?" — to which defense

counsel objected on asked-and-answered grounds.  "Well," the judge said, "I understood he had no head.  But it's no face, no head?  Tell us."  "It had no face of any kind," the witness replied.

Later still, an agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (commonly referred to just as "ATF") testified "as an interstate nexus specialist" (FYI, some statutes have an interstate-nexus requirement, which gives rise to federal jurisdiction under the Constitution).  As the agent talked about different firearms — Glock pistols, Smith and Wesson pistols, a Bushmaster rifle, *etc.* — the prosecutor asked each time if any were manufactured in Puerto Rico.  The agent always said no, adding one time that "[i]f they were possessed in Puerto Rico, they traveled in or [a]ffect[ed] interstate commerce."  Asked about "an AR-15 type rifle," the agent testified that the rifle had no manufacturer's mark and so he could not determine the rifle's "place of origin."  Speaking up, the judge questioned him about whether "we manufacture any kind of gun in Puerto Rico."  "No, sir," said the agent.  "So what does that mean in terms of nexus?" the judge wondered.  Because "this firearm was not manufactured in Puerto Rico," the agent replied, "if it was possessed in Puerto Rico, it traveled in or [a]ffect[ed] interstate commerce."

Early in the afternoon, after the agent testified, Astacio-Espino's lawyer asked for a mistrial because the judge

- 19 -

"ha[d] intervened with a great number of witnesses." Lanza-Vázquez's and Rivera-Carasquillo's counsel joined the request. But the judge denied the motion, simply saying that "you will have to take" this issue "to the Court of Appeals."

*Arguments and Analysis*

Pointing to these incidents, Astacio-Espino, Lanza-Vázquez, and Rivera-Carasquillo claim that the judge denied them a fair trial by asking questions or making comments that emphasized the brutality of the charged crimes and that helped the government establish a nexus between the guns and interstate commerce.[9] The government argues that because the judge's interjections simply clarified the record or kept the lengthy proceedings on track (the trial involved nine days of testimony), his actions crossed no line — and even if they did, any error was harmless, given the considerable evidence of appellants' guilt. Because we agree with the government's first point, we need not address its second.

We review the judge's denial of a mistrial motion for abuse of discretion, which occurs if no reasonable person could

---

[9] Appellants call the discussed interjections only a "partial sample" of the "most egregious" ones. But by only mentioning those interjections in their opening briefs, they waived any argument that other interjections prejudiced them. See, e.g., Rodríguez v. Municipality of San Juan, 659 F.3d 168, 175 (1st Cir. 2011).

- 20 -

agree with the ruling.[10]  See United States v. Munyenyezi, 781 F.3d 532, 541 (1st Cir. 2015).  Deference is appropriate here because the judge was best positioned to decide if what happened was serious enough to justify declaring a mistrial — a "drastic remed[y]" of last resort.  See id. at 541-42.

Trial judges have considerable leeway over the interrogation of witnesses and the order of proof — leeway they must use to (among other things) elicit truth and avoid delay. See, e.g., Morales Feliciano v. Rullán, 378 F.3d 42, 57 (1st Cir. 2004); Fed. R. Evid. 611(a).  So, for example, judges can "question witnesses"; "analyze, dissect, explain, summarize, and comment on the evidence"; and otherwise extract facts to clarify misunderstandings.  Logue v. Dore, 103 F.3d 1040, 1045 (1st Cir. 1997); see also United States v. Ayala-Vazquez, 751 F.3d 1, 24 (1st Cir. 2014); United States v. Paz Uribe, 891 F.2d 396, 400 (1st Cir. 1989).  And because protracted trials drain scarce judicial resources (judge and jury time, to name just two), judges must keep the proceedings moving — by, for instance, making sure evidence presentation does not become rambling and repetitive (to state the obvious, district courts have heavy caseloads and jurors

---

[10] The parties concur that appellants preserved the issue for us.  And we have no reason to doubt them.

- 21 -

have family and work obligations).  See, e.g., Logue, 103 F.3d at 1045.

Make no mistake, however.  While "[t]he ultimate responsibility for the effective working of the adversary system rests with . . . judge[s]," see Fed. R. Evid. 611(a) advisory committee's note to 1972 proposed amendment, their powers are not boundless — for they "cannot become . . . advocate[s] or otherwise use [their] judicial powers to advantage or disadvantage a party *unfairly*," see Logue, 103 F.3d at 1045 (1st Cir. 1997) (emphasis added); see also Morales Feliciano, 378 F.3d at 57.  But to prevail on an inappropriate-judicial-intervention claim, the protesting party must show both "improper" conduct and "serious prejudice."  See United States v. DeCologero, 530 F.3d 36, 56 (1st Cir. 2008).

Silhouetted against these rules, appellants' claim cannot succeed.  Take the face-related episodes (*e.g.*, the "erase the face," "at his face," and "pulled the trigger" interactions).  What appellants characterize as out-of-bounds questioning we see as the fulfillment of the judge's "duty" to "elicit[] facts he deem[ed] necessary" to clarify the record for the jury.  See Paz Uribe, 891 F.2d at 400 (quoting Llach v. United States, 739 F.2d 1322, 1329 (8th Cir. 1984)).  Now consider the location-of-gun-manufacturers questions.  As the government notes (without contradiction from appellants), "that the firearms were

- 22 -

manufactured outside of Puerto Rico was not a hotly contested issue."  And we see the incident as a permissible bid by the judge to speed up the multiday trial's pace.  See United States v. Henry, 136 F.3d 12, 19 (1st Cir. 1998) (discussing the "judge's right and responsibility to manage the progress of the trial").  On top of everything, the judge told the jurors "not [to] assume that I hold any opinion on any matter that pertains to any question that I may have asked."  He also told them that they could "disregard all questions that I made during the course of this trial."  "You don't have to go by my comments," he added.  "I am not here to lead you." And these instructions sufficed to alleviate any risk of prejudice. See Logue, 103 F.3d at 1046-47.[11]

_____

[11] Two more matters and we are done with this issue.  About five months before our appellants' trial, the judge, in sentencing a separately tried codefendant, mentioned the "Pep Boys" murder — a murder that involved the death of a La Rompe boss, killed on the orders of two La ONU leaders.  See Ramírez-Rivera, 800 F.3d at 44 (discussing the "Pep Boys" murder).  And the judge said how deeply that crime had affected him.  Appellants theorize that the judge's "feelings" fueled his "improper questioning and interjecting" at their later trial.  They also cry foul that the judge questioned the cooperating witness even though (emphases theirs) "*he himself* took the witness'[s] guilty plea so the witness could cooperate in the first place."  But they did not raise either argument below. And they give us no reason to conclude that any of the "narrowly configured and sparingly dispensed" exceptions to the raise-or-waive rule apply.  See Daigle v. Me. Med. Ctr., Inc., 14 F.3d 684, 688 (1st Cir. 1994).  Nothing more need be said about these arguments.

- 23 -

The short of it is that we will reverse a mistrial denial only in "extremely compelling circumstances." See, e.g., Munyenyezi, 781 F.3d at 542 (quoting United States v. Pierro, 32 F.3d 611, 617 (1st Cir. 1994)). But they have not shown that the circumstances here meet that standard. So the judge's mistrial denial stands.

**Admission-of-Photos Claim**

Repeating a losing argument made below, Astacio-Espino, Lanza-Vázquez, and Rivera-Carasquillo fault the judge for admitting 61 color autopsy and crime-scene photos (some showing murder victims without a face or head, others showing blood or brain matter splattered everywhere) and 43 color gun photos (depicting firearms Rivera-Carasquillo had at the time of his arrest), along with actual guns, gun parts, and ammo. As they see it, the gruesomeness of the autopsy and crime-scene photos had to have overwhelmed the jurors' emotions and led them to act irrationally. So they believe the judge should have excluded those photos under Evidence Rule 403, which says a judge may keep out "relevant evidence" if its potential for unfair prejudice "substantially outweigh[s]" its probative worth. See Fed. R. Evid. 403. Repeating another losing argument made below, they also insist that law enforcement seized the at-issue guns after the conspiracy had ended. And so they further believe the judge should

- 24 -

have excluded those photos — introduced, the theory goes, to portray them as bad men, and hence guilty of the crimes charged — under Evidence Rule 403 and Evidence Rule 404(b), which prohibits evidence of a "crime, wrong, or other act" from being used "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." See Fed. R. Evid. 404(b).

The government, contrastingly, contends no error occurred. Noting that we will reverse a judge's Rule 403 probative value/unfair prejudice balancing only in extraordinarily compelling situations, the government argues that the autopsy and crime-scene photos did not *unfairly* prejudice appellants because, for example, the photos "corroborated actions taken by La ONU members, including [appellants]."[12] And according to the government, rather than being inadmissible as unduly prejudicial under Rule 403 or as improper character evidence under Rule 404(b), the gun evidence showed Rivera-Carasquillo's role as a gun-supplier to La ONU and how he continued to store guns even after the indictment came down. The government claims too that "La ONU's activities were ongoing even after" the indictment's "issuance,"

---

[12] The government asserts, without contradiction, that its "case-in-chief" covered "eight crime scenes involv[ing] twelve murders."

at which time Rivera-Carasquillo was a fugitive without having withdrawn from the conspiracy. As a fallback, the government argues that whatever conceivable error might have occurred was harmless.

Recognizing that "[t]he simplest way to decide [an issue] is often the best," Stor/Gard, Inc. v. Strathmore Ins. Co., 717 F.3d 242, 248 (1st Cir. 2013) (quoting Chambers v. Bowersox, 157 F.3d 560, 564 n.4 (8th Cir. 1998)), we assume *without deciding* that errors occurred. But we deem them harmless nevertheless.

Nonconstitutional errors are harmless — and so do not require a new trial (saving the public the costs and delays caused by a retrial when the outcome would not change) — if we "can say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole,'" that the errors did not "'substantially sway[]'" the jury's verdict. United States v. Melvin, 730 F.3d 29, 39 (1st Cir. 2013) (quoting United States v. Sasso, 695 F.3d 25, 29 (1st Cir. 2012)). The government bears the burden of proving harmlessness. See, e.g., United States v. Vázquez, 724 F.3d 15, 25 (1st Cir. 2013). Now recall how cooperating witnesses pegged Astacio-Espino, Lanza-Vázquez, and Rivera-Carasquillo as La ONU drug-point owners and enforcers — each of whom, according to these witnesses, participated in the gun murders of others, all in La ONU's name. True, the cooperators

had reasons to tailor their testimony to please the prosecution. But defense counsel brought this out during cross-examination and closing arguments.  The judge also told the jury that it should consider the cooperators' testimony "with particular caution" and with an eye toward whether they "had a reason to make up stories or to exaggerate what others did because they wanted to help themselves."  Anyway, the jury could believe what the cooperators said.  See, e.g., United States v. Rodríguez-Soler, 773 F.3d 289, 297 (1st Cir. 2014).  And if the jury did, it could enter guilty verdicts — as Astacio-Espino's counsel candidly acknowledged during summation.[13]  So, bluntly stated, even if the judge gaffed by admitting the crime-scene and gun evidence — and we whisper no hint of suggestion about whether he did — appellants cannot prevail because, given the contours of this case, we can fairly say that

---

[13] A quick side note.  When an error is of constitutional magnitude, we cannot consider it harmless if the rest of the government's case against the defendant (or defendants) rests solely on cooperator testimony.  See, e.g., United States v. Ofray-Campos, 534 F.3d 1, 27 (1st Cir. 2008).  Appellants do not claim that the error they identify here is of the constitutional variety. And they make no argument that the Ofray-Campos rule (for lack of a better label) applies in a nonconstitutional-error situation like theirs.  Perhaps that is because Rodríguez-Soler is on the books, a case where we held a nonconstitutional error harmless based on "the cooperating witnesses' testimony," see 773 F.3d at 297 — though, to be fair, there's no indication in Rodríguez-Soler that the defendant argued for the application of the Ofray-Campos rule.  Ultimately, by not pushing for application of the Ofray-Campos rule here, appellants waived any argument on that front that they might have had.  See, e.g., Rodríguez, 659 F.3d at 175.

any error (if error there be) did not "substantially sway" the jury's verdict.

## Jury-Instruction Claim

### *Background*

A necessary element for a RICO-conspiracy conviction is that "the defendant agree[d] to commit or actually commit[ted] two or more acts of racketeering activity." United States v. Shifman, 124 F.3d 31, 38 (1st Cir. 1997); see also id. at 35 (discussing the other elements). "Racketeering activity" includes "any act or threat involving" particular federal or state crimes like, for example, drug trafficking, murder, extortion, robbery, and kidnapping. See 18 U.S.C. § 1961(1)(A). "[T]he commission of firearms offenses" appears nowhere on that list, however. See United States v. Latorre-Cacho, 874 F.3d 299, 301 (1st Cir. 2017).

Instructing the jury on the racketeering-activity issue, the judge in our case said "that as a matter of law, drug trafficking and murder both qualify as racketeering activities." So far, so good. A little later, though, the judge added (emphasis ours) that "the types of racketeering activity alleged include possession with intent to distribute narcotics, *firearms*[,] and murder." Later still, the judge instructed (emphasis added) that

> to convict the defendant of the RICO conspiracy offense, your verdict must be unanimous as to which types of predicate racketeering activities the defendant agreed would be committed. For example, at least two acts of

- 28 -

> drug trafficking, murder, or any combination of both. I would add two acts of drug trafficking, *firearms*, murders[,] or a combination thereof.

The judge then noted that "[t]he [i]ndictment accuses the defendants of two different types of racketeering activity," namely, "drug trafficking and murder." The judge returned to that theme, saying "racketeering activity . . . includ[es] drug trafficking, murder[,] or any combination thereof" and that "[t]he indictment alleges that the enterprise, through its members and associates, engaged in racketeering activities consisting of drug trafficking and murder."

### *Arguments and Analysis*

Astacio-Espino and Rivera-Carasquillo — the only appellants charged with RICO conspiracy (Lanza-Vázquez was not so charged) — assert that the judge plainly erred by twice telling the jury that a firearms crime *is* a racketeering activity for RICO-conspiracy purposes (plain error is the standard for all arguments, like this one, debuted on appeal).[14] Simplifying matters, the

---

[14] Most readers of our prior opinions know the plain-error standard by heart, but a little refresher never hurts. A super hard standard to establish, plain error has four prongs. See, e.g., Puckett v. United States, 556 U.S. 129, 135 (2009); United States v. Shoup, 476 F.3d 38, 42-43 (1st Cir. 2007); United States v. González-Vélez, 466 F.3d 27, 35 (1st Cir. 2006). First, complaining parties must identify an "error" that they have not "intentionally relinquished or abandoned." Puckett, 556 U.S. at 135. Second, they must show that the error was "clear or obvious, rather than subject to reasonable dispute." Id. Third, they must prove that the error "affected" their "substantial rights" — *i.e.*,

government admits that, given Latorre-Cacho, the judge did err, and clearly so — satisfying Astacio-Espino's and Rivera-Carasquillo's burden under the first and second prongs of the plain-error test. The real battle then is over whether Astacio-Espino and Rivera-Carasquillo can meet the third and fourth prongs. They say they can, making the dual argument that the misinstruction prejudiced them, because it likely affected the case's outcome — fulfilling their burden under prong three; and that the misinstruction worked a miscarriage of justice, because the government did not present overwhelming and essentially uncontroverted evidence on the racketeering-activity element — fulfilling their burden under prong four. The government's response is dual too: the instructions *as a whole* were unlikely to mislead the jury, seeing how the judge emphasized drug trafficking and murder as cognizable predicates; and even if the

---

that "it likely affected" the case's outcome. United States v. Almonte-Nuñez, 771 F.3d 84, 89 (1st Cir. 2014). Fourth and finally, if they satisfy these prongs they must show that the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings," which is also known as the miscarriage-of-justice prong — then (and *only then*) will we exercise our "discretion to remedy the error." See Puckett, 556 U.S. at 135 (internal quotation marks omitted); United States v. Saxena, 229 F.3d 1, 5 (1st Cir. 2000). And "[g]iven the rigors of this standard, [our] power to set aside trial court decisions due to plain error 'should be employed sparingly.'" United States v. Bramley, 847 F.3d 1, 5 (1st Cir. 2017) (quoting United States v. Padilla, 415 F.3d 211, 221 (1st Cir. 2005) (en banc)).

instructions likely misled the jury, there is no reasonable probability that the flawed instructions led to flawed convictions — so they cannot show either prejudice or a miscarriage of justice.

As for our views on the matter, we know "the plain error hurdle, high in all events, nowhere looms larger than in the context of alleged instructional errors." See United States v. Paniagua-Ramos, 251 F.3d 242, 246 (1st Cir. 2001). And ever mindful of this demanding standard, we cannot help but reject Astacio-Espino and Rivera-Carasquillo's claim.

The jury had no special verdict form on the RICO-conspiracy count. But the jury found Astacio-Espino guilty of *six* predicate RICO acts: drug trafficking, VICAR attempted murder, and four VICAR murders. The jury also found Rivera-Carasquillo guilty of *four* predicate RICO acts: drug trafficking and three VICAR murders. And significantly for this case, Astacio-Espino and Rivera-Carasquillo fail to adequately challenge the evidence behind these convictions (through citation to trial testimony and supporting legal authority, for example). So they have not met their heavy burden of showing that the trial's outcome would likely have changed had the judge not erred. After all, "[w]here" — as here — "the effect of an alleged error is so uncertain, a [party] cannot meet his burden of showing that the error actually affected his substantial rights." See Jones v. United States, 527 U.S.

373, 394-95 (1999). And because Astacio-Espino and Rivera-Carasquillo have not shown a likelihood that they were "worse off" because of the judge's mistake, they "perforce" cannot show that a miscarriage of justice will result if we do not correct the mistake. See United States v. Turbides-Leonardo, 468 F.3d 34, 40 (1st Cir. 2006).

Latorre-Cacho does not help Astacio-Espino and Rivera-Carasquillo's prejudice and miscarriage-of-justice positions, despite what they say. A grand jury there indicted Jose Latorre-Cacho for conspiracy to violate RICO, conspiracy to engage in drug trafficking, and conspiracy to possess a firearm in furtherance of a drug-trafficking crime. 874 F.3d at 301. At trial, the district judge (the same judge who presided over our appellants' trial) "twice incorrectly" told the jury that "'firearms' constitutes 'racketeering activity.'" Id. After the jury convicted him only on the RICO-conspiracy charge, Latorre-Cacho appealed to us, complaining (as relevant here) about the judge's faulty instructions, id. — the theory being that the incorrect charge let the jury find him guilty of RICO conspiracy "on a legally invalid theory of what constitutes 'racketeering activity' by defining 'racketeering activity' to include 'firearms,'" id. at 302-03. The government seemingly conceded that the judge erred and plainly so, leaving us to decide whether Latorre-Cacho met the remaining

prongs of the plain-error standard.  See id. at 303.  In finding that Latorre-Cacho satisfied prong three, we could not say that the evidence of the proper predicates — drug trafficking, robbery, and carjacking — was overwhelming and essentially uncontroverted. Id. at 306, 311.  Indeed, the jury actually *acquitted* him on the drug-trafficking-conspiracy charge.  Id. at 301, 311.  And having found that prong satisfied, we "[could] not see how" plain error's "fourth prong" prevented him from "demonstrating plain error" — especially since the government did not make any developed argument that he failed to satisfy that prong.  Id. at 311.  All of this is worlds apart from our case, however — most notably because the jury *convicted* Astacio-Espino and Rivera-Carasquillo on related drug-conspiracy and VICAR counts and because the government did not waive its right to contest a plain-error finding.[15]

On to the next claim, then.

---

[15] Noting that the VICAR statute also has a racketeering-activity component, Astacio-Espino and Rivera-Carasquillo make a one-sentence argument that we should vacate their VICAR convictions because the judge's "instructions on this element of VICAR, which followed his instructions on RICO conspiracy, were at best confusing and allowed the jury to find that 'firearms' offenses were the crimes that constituted the racketeering activity."  But they do not tie this unpreserved VICAR-centric argument to the demanding plain-error standard and thus have waived it.  See United States v. Ponzo, 853 F.3d 558, 574 (1st Cir. 2017).

## New-Trial Claim

*Background*

During appellants' trial, the jury heard from three cooperating coconspirators — ex-La ONU members Wesley Figueroa-Cancel, José Gutiérrez-Santana, and Christian Figueroa-Viera — about the roles appellants played in the killing of Pekeke, a La Rompe leader gunned down (according to the cooperators) by La ONU in its brutal war with La Rompe. And Figueroa-Cancel, Gutiérrez-Santana, and Figueroa-Viera knew of which they spoke, since they had a hand in Pekeke's death.

While here on appeal, appellants filed in the district court what they styled a motion for new trial based on newly-discovered evidence and government nondisclosure of evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963). See Fed. R. Crim. P. 33(b)(1). They did not have the "newly discovered evidence," however. Rather, their lawyers claimed that they learned that codefendants convicted in a jury trial before Judge Smith had moved for a new trial and that restricted-court filings in that case supposedly showed that "a cooperating witness [gave] a contradictory version of" Pekeke's murder "in grand jury testimony, an FBI 302[,] and trial transcripts" — contradictory, because the cooperator there had supposedly said that *La Rompe*

members (and them alone) had killed Pekeke.[16]  If the government had "disclosed" that evidence before or during "their trial, there is a reasonable probability" that the trial's outcome "would have been different" — at least that is what our appellants' motion contended, citing United States v. Flores-Rivera, 787 F.3d 1, 15-16 (1st Cir. 2015) (noting that a successful Brady claim "require[s] only that the defendant show a 'reasonable probability' that had the government disclosed the evidence [before] trial, the result of the proceeding would have been different" (quoting United States v. González-González, 258 F.3d 16, 20 (1st Cir. 2001))).  And based on all this, appellants requested three things:  (1) access to the restricted filings; (2) an order directing the government to disclose any info "indicat[ing] that any murder or other incident described by" testifying witnesses "did not occur" as they had testified, "or otherwise casting doubt on the credibility or reliability of any of the witnesses and/or other evidence used against them"; and,

---

[16] Appellants' codefendants in the Judge Smith presided-over trial were José Laureano-Salgado and Pedro Ramírez-Rivera. Figueroa-Cancel, Gutiérrez-Santana, and Figueroa-Viera testified for the prosecution in that case too.  Readers can find more details of what happened before Judge Smith in another opinion issued today, United States v. Laureano-Salgado, ___ F.3d ___ (1st Cir. 2019) [Nos. 17-1052, 1053] — where we affirmed the denial of that motion.  And going forward we will assume the readers' familiarity with that opinion.

- 35 -

finally, (3) a new trial.  They also contemporaneously moved the judge for an "indicative ruling" that their new-trial motion "based on newly discovered evidence of a potential <u>Brady</u> violation 'raises a substantial issue.'"  <u>See</u> Fed. R. Crim. P. 37.[17]

Opposing the motions, the government first argued that it did not have the sought-after materials before or during appellants' trial.  The government next asserted that it gave appellants the materials after they filed their motion, thus mooting their request.  And the government then contended that the materials involved statements made by cooperating witnesses from La Rompe, none of whom were present when Pekeke got killed.

Accusing the government of making an "incomplete" disclosure, appellants blasted prosecutors in their reply memo for

_____

[17] As a leading treatise in the field explains:

> If a party moves for relief in the district court that the court has no power to grant because an appeal is pending, Rule 37(a) provides the district court with three options:  it may (1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue.  If the district court takes approach (3) and states that it would grant the motion or that the motion raises a substantial issue, Rule 37(b) requires the movant to notify the circuit clerk promptly.  Then the movant can ask the court of appeals to remand to allow the district court to consider the motion.

3 Charles Alan Wright et al., *Federal Practice and Procedure: Criminal* § 644.1 (4th ed. 2019) (footnotes, citations, and internal quotation marks omitted).

violating "Brady" — an accusation the government denied in its surreply memo. They later stated in an "informative motion" that the government had disclosed additional documents containing "sometimes inconsistent accounts by witness Luis Yanyoré-Pizarro" concerning Pekeke's murder. Focusing on an FBI interview memo, they wrote that Yanyoré-Pizarro's version "describe[d] — directly contrary to the government's account at [their] trial — why" a La Rompe leader had ordered Pekeke's murder, and how "this killing was not part of the [La] ONU-[La] Rompe 'war.'"

The judge rejected appellants' Brady-based theory, noting that nothing supports the notion that the government had the material before or during their trial and so Brady does not apply. And then the judge dashed their new-trial hopes. Quoting Flores-Rivera, 787 F.3d at 15 — which quoted González-González, 258 F.3d at 20, which in turn quoted United States v. Wright, 625 F.2d 1017, 1019 (1st Cir. 1980) — the judge set out the standard for granting a new-trial motion based on newly-discovered evidence, which requires that

> (1) the evidence was unknown or unavailable to the defendant at the time of trial; (2) failure to learn of the evidence was not due to lack of diligence by the defendant; (3) the evidence is material, and not merely cumulative or impeaching; and (4) it will probably result in an acquittal upon retrial of the defendant.

This is known variously as the "Wright test" or the "Wright standard." See United States v. Martínez-Mercado, 919 F.3d 91,

- 37 -

105 (1st Cir. 2019); United States v. Maldonado-Rivera, 489 F.3d 60, 66 (1st Cir. 2007).  Anyhow, the judge noted that Judge Smith had found Yanyoré-Pizarro's statements too unclear and seemingly inconsistent to satisfy the Wright test.  And she agreed with that take.  Yanyoré-Pizarro's "account of Pekeke's murder," she wrote, "appears to have been as variable as the wind," blaming, "at different points," different persons for Pekeke's murder.  She also thought that Yanyoré-Pizarro lacked personal knowledge of many of the material facts surrounding Pekeke's death and was merely "repeating the gossip he had heard about the different people" supposedly "behind the death."  So the judge ruled that our appellants had not shown that Yanyoré-Pizarro's  "testimony . . . would probably result in their acquittal" in any "retrial."

Undaunted, appellants later asked the judge to reconsider.  As support, they argued that on the very day the judge denied their motions, Yanyoré-Pizarro testified at a hearing for separately-tried codefendant Cruz-Ramos and again gave an account of Pekeke's murder that differed from the testimony presented by the government at their trial — an account (as described by them) indicating that a La Rompe leader ordered Pekeke killed to settle "an internal dispute" among [La] Rompe members.  "[I]f a jury were to believe that version," they wrote, "it is more than reasonably likely that none of [them] would have been convicted of the murder

- 38 -

of 'Pekeke.'" They thought this way because the government prosecuted Pekeke's murder "on the basis of the VICAR statute" — a statute that (to again quote from their motion) forbids "murder . . . committed for the purpose of acquiring, maintaining or increasing a position in . . . La ONU."[18] And in their view, this "newly discovered evidence" would sabotage the VICAR statute's purpose element. They did not discuss — or even cite — <u>Wright</u> or its offspring, however.

The government countered that Yanyoré-Pizarro had "no personal knowledge" about Pekeke's murder and that his testimony shed no light on what "motivat[ed]" our appellants "to participate" in the murder. Arguing further, the government claimed that Yanyoré-Pizarro's statements actually corroborated "facts proven at trial," like his confirming that a guy named Joshua had shot Pekeke.

Still convinced that our appellants had not fulfilled their burden for obtaining a new trial, the judge denied their reconsideration motion in a docket order.

---

[18] <u>See</u> <u>United States</u> v. <u>Brandao</u>, 539 F.3d 44, 56 (1st Cir. 2008) (noting both that "the motive requirement in VICAR [is] a general one, satisfied by proof either that the crime was committed in furtherance of defendant's membership in the enterprise or because it was expected of him by reason of his membership," and that the government is not required to "prove this was *sole* purpose").

*Arguments and Analysis*[19]

Astacio-Espino, Lanza-Vázquez, and Rivera-Carasquillo do not contest the judge's ruling that they had no right to post-conviction discovery. They challenge only the judge's ruling that they had no right to a new trial. And on that score, they argue that they should get a new trial under the Wright test. To their way of thinking, "[t]he after-discovered [Yanyoré-Pizarro] evidence tends to support the conclusion that Pekeke's murder was the result of cooperation between" La Rompe and La ONU, "not the result of La ONU acting" on its own because the gangs "were at war with each other." The evidence thus destroys "the required 'purpose' element of the VICAR statute," their argument runs — and so if the jury had heard and believed Yanyoré-Pizarro's version, "it is probable that none of them would have been convicted of the murder of Pekeke." Disagreeing, the government asserts that appellants waived their Wright-based argument by not making it below. Waiver aside, the government believes that their claim flops because the so-called "newly discovered evidence" is based on inadmissible hearsay, meaning the evidence lacks materiality

---

[19] Earlier, the government questioned whether our appellants filed timely notices of appeal. But the government now agrees with them that they did. And we will assume without deciding that they are right. See, e.g., United States v. Uribe-Londono, 177 F. App'x 89, 89 n.2 (1st Cir. 2006) (taking the assuming-without-deciding approach).

and would not probably produce a new result at a retrial.  For our part, we think the government is right about waiver — so we start and stop there.

To succeed in a typical new-trial motion alleging newly-discovered evidence, a defendant must satisfy all four elements of the Wright test — *i.e.*, and to repeat, he must show that the evidence (1) was either unknown or unavailable at time of trial; (2) could not have been discovered sooner with due diligence; (3) is material, not merely cumulative or impeaching; and (4) would probably lead to acquittal at a retrial — a heavy burden for any defendant.  See, e.g., United States v. Peake, 874 F.3d 65, 69 (1st Cir. 2017); Flores-Rivera, 787 F.3d at 15; Maldonado-Rivera, 489 F.3d at 65-66.

If, on the other hand, the defendant bases his new-trial motion on the delayed disclosure of Brady evidence — which consists of exculpatory or impeaching evidence — a more defendant-friendly standard applies:  he must still meet elements one and two (unavailability and due diligence), though caselaw swaps out elements three and four (materiality and prejudice) for a

> unitary requirement that the defendant . . . demonstrate only a *reasonable probability* that, had the evidence been disclosed to the defense in a timely manner, the result of the proceeding would have been different.

Peake, 874 F.3d at 69 (emphasis added and internal quotation marks omitted).  What makes this standard more defendant-friendly (at

- 41 -

least for present purposes) is that rather than having to show "'*actual* probability that the result would have differed,'" a defendant need only show "something sufficient to 'undermine[] confidence'" in the jury's verdict. See United States v. Mathur, 624 F.3d 498, 504 (1st Cir. 2010) (emphasis and alteration in original) (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)); accord Flores-Rivera, 787 F.3d at 15-16; see also United States v. Sepulveda, 15 F.3d 1216, 1220 (1st Cir. 1993) (explaining that the "somewhat delphic 'undermine confidence' formula suggests that reversal might be warranted in some cases even if there is less than an even chance that the evidence would produce an acquittal").

Ultimately, we review a judge's decision under either standard only for abuse of discretion. See, e.g., United States v. Connolly, 504 F.3d 206, 211-12 (1st Cir. 2007).

Back to our case. Appellants made Brady-based arguments in their new-trial motion, using the "reasonable probability" standard that governs new-trial requests tied to alleged Brady violations. Indeed, in pressing their motion, they cited to Flores-Rivera — a Brady-based case involving the modified standard, not the Wright standard. See 787 F.3d at 8. They did not mention, let alone apply, the Wright test. Which defeats their attempt to do so here, because "legal theories not asserted in the lower court cannot be broached for the first time on appeal." See

- 42 -

Goodwin v. C.N.J., Inc., 436 F.3d 44, 51 (1st Cir. 2006); see also

McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 n.7 (1st Cir. 1991)

(adding that "[c]ourts are entitled to expect represented parties

to incorporate all relevant arguments in the papers that directly

address a pending motion").  The raise-or-waive rule is "founded

upon important considerations of fairness, judicial economy, and

practical wisdom."  Nat'l Ass'n of Soc. Workers v. Harwood, 69

F.3d 622, 627 (1st Cir. 1995).  And appellants offer no reason not

to apply that rule in the circumstances of this case.  So their

new-trial claim is a no-go.[20]  See Eldridge v. Gordon Bros. Grp.,

L.L.C., 863 F.3d 66, 85 (1st Cir. 2017).

We should add (as a quintessential belt-and-suspenders

maneuver) that even if we were willing to overlook appellants'

---

[20] A subheading in Astacio-Espino's lead brief suggests that the judge erred by denying the new-trial motion "Without a Hearing" — a suggestion adopted by his coappellants.  But their appellate papers never explain how the no-hearing here amounts to reversible error.  Which means the argument is waived.  See, e.g., Tutor Perini Corp. v. Banc of Am. Sec. LLC, 842 F.3d 71, 96 (1st Cir. 2016).

Astacio-Espino writes in his reply brief that "[t]he matter had not even reached the point [below] where the defendants might in good faith have requested an evidentiary hearing, much less the point where they might have filed a memorandum showing satisfaction of the four Wright factors" — contentions shared by his coappellants.  But because they did not raise these arguments until the reply brief, we consider them waived, see United States v. Marino, 833 F.3d 1, 6 n.3 (1st Cir. 2016) — particularly since they highlight no "extraordinary circumstances" justifying any easing of this customary rule, see Lawless, 894 F.3d at 25.

waiver of a Wright-centric argument — and we most certainly are *not* — they would still lose.  The judge, to repeat, agreed with Judge Smith that Yanyoré-Pizarro indicated that various people had various motives for offing Pekeke.[21]  The judge also agreed with Judge Smith that given Yanyoré-Pizarro's changing narrative, appellants cannot satisfy their hefty burden of showing that the relied-on statements make it actually probable that a jury would acquit them on retrial.  Affirming Judge Smith's ruling, Laureano-Salgado stressed that "[a]t any new trial the jury would weigh" (a) "Yanyoré-Pizarro's shifting" account and his lack of personal knowledge of certain details behind Pekeke's murder against (b) the testimony of Figueroa-Cancel, Gutiérrez-Santana, and

---

[21] Laureano-Salgado, ___ F.3d at ___ [Nos. 17-1052, 1053, slip op. at 22] provides a detailed discussion of Yanyoré-Pizarro's ever-shifting finger-pointing.  We excerpt a key passage here, however (we add the bracketed information for clarity):

> [Yanyoré-Pizarro's] statements . . . show that [he] basically suggested that *different persons* had *different motives* for killing Pekeke:  (a) La Rompe[] [leaders known as] Trenza and Papito Mojica, apparently to take over Pekeke's drug points; (b) La Rompe bosses at the Alturas de Cupey housing project, supposedly because Pekeke had refused their help request [regarding their drug business]; (c) [a] La Rompe[] [member known as] Frank, apparently because Frank and Pekeke could not agree on who was "the boss" — in his last version of this narrative, Yanyoré-Pizarro had Frank working with *La ONU* to gun down Pekeke; and (d) gangbangers from the Luis Llorén Torres housing project, supposedly because Pekeke had orchestrated their leader's murder.

Id.

Figueroa-Viera "implicating" the defendants there "in [the] slaying" and showing that these witnesses helped take Pekeke down. Laureano-Salgado, ___ F.3d at ___ [Nos. 17-1052, 1053, slip op. at 22-23]. So too here. Laureano-Salgado also concluded that the "evidentiary comparison" showed that Yanyoré-Pizarro's varying accounts "are not 'sufficiently compelling' as to generate a realistic probability of an acquittal on the VICAR" charges. Id. [slip op. at 23] (quoting United States v. Alicea, 205 F.3d 480, 487 (1st Cir. 2000)). And again, so too here. Which is why appellants are out of luck here, waiver or not.

One last claim, and we are done.

### Crime-of-Violence Claim

As we mentioned many pages ago, the jury found Astacio-Espino, Lanza-Vázquez, and Rivera-Carasquillo guilty on various counts of using and carrying a firearm during a "crime of violence" — *i.e.*, VICAR murder predicated on Puerto Rico's murder statute — in violation of 18 U.S.C. § 924(c)(1)(A).[22] A "crime of violence," you should know, is any felony offense that

---

[22] The pertinent Puerto Rico statute, P.R. Laws Ann. tit. 33, § 4734, provides that first-degree murder is

(a) Any murder committed by means of poison, stalking or torture, or with premeditation.

(b) Any murder committed as a natural consequence of the attempt or consummation of aggravated arson, sexual assault, robbery, aggravated burglary, kidnapping, child abduction, serious damage or destruction, poisoning of

- 45 -

(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

Courts sometimes call subparagraph (A) the "force clause" and subparagraph (B) the "residual clause." See, e.g., United States v. Taylor, 848 F.3d 476, 491 (1st Cir. 2017).

Our appellants believe first-degree murder under Puerto Rico law is not a crime of violence under either the force clause or the residual clause. Because they (admittedly) did not raise the crime-of-violence issue below, they must now run the gauntlet of plain-error review — a very-difficult-to-meet standard, remember (see footnote 14), that requires them to "show (1) error, (2) plainness, (3) prejudice [to them], and (4) an outcome that is a miscarriage of justice or akin to it." See United States v. Edelkind, 467 F.3d 791, 797 (1st Cir. 2006); see also United States v. Pabon, 819 F.3d 26, 33 (1st Cir. 2016) (stressing that "[t]he party asserting plain error bears the burden of persuasion"); see

bodies of water for public use, mayhem, escape, and intentional abuse or abandonment of a minor.

(c) The murder of a law enforcement officer, school police, municipal guard or police officer, marshal, prosecutor, solicitor for minors' affairs, special family solicitors for child abuse, judge or custody officer in the performance of his duty, committed while carrying out, attempting or concealing a felony.

generally Puckett, 556 U.S. at 135 (emphasizing that meeting all four plain-error factors "is difficult, as it should be").

Helpfully for appellants, after the completion of briefing here, the Supreme Court struck down the residual clause as unconstitutionally vague. See United States v. Davis, 139 S. Ct. 2319, 2336 (2019). And with the residual clause now out of way, they must convince us that a violation of Puerto Rico's murder statute cannot be a crime of violence under the force clause. They say they can because, in their words, Puerto Rico's murder statute "has no element requiring the intentional use, attempted use, or threatened use of violent physical force" — "killing," they write, "could encompass non-physical force." The government says they cannot because, to quote its brief, "common sense" suggests that there is probably no "more 'violent' crime than premeditated murder."

Right off the bat, though, appellants have a problem. Under a brief subheading titled "Defendants Meet the Plain Error Standard," appellants explain why they should get plain-error relief since a violation of Puerto Rico's murder statute cannot be a crime of violence under the *residual clause* — a point well taken, especially given the Supreme Court's hot-off-the-presses Davis decision. But (and it's a very big but) they do not explain why reliance on the *force clause* here is plain error — for example,

they never say how any error (if error there was) is "plain," *i.e.*, "an 'indisputable' error . . ., 'given controlling precedent.'" See United States v. Morosco, 822 F.3d 1, 21 (1st Cir. 2016) (quoting United States v. Correa-Osorio, 784 F.3d 11, 22 (1st Cir. 2015)). Properly applying force-clause precedent is no picnic (an understatement if ever there was one), seeing how the "'crime of violence'" definition "is complex and unclear." See U.S.S.G., Supplement to Appendix C, Amend. 798 at 119 (2018). So the parties must give us the help we need — again, it is for them, not us, to "develop[] sustained argument out of . . . legal precedents." See Town of Norwood v. Fed. Energy Reg. Comm'n, 202 F.3d 393, 404-05 (1st Cir. 2000). But what our appellants have done — making no effort to satisfy *every* part of the plain-error test on the force-clause question (despite having the burden of proving plain error) — "is hardly a serious treatment of a complex issue." See Tayag v. Lahey Clinic Hosp., Inc., 632 F.3d 788, 792 (1st Cir. 2011). Which dooms their crime-of-violence claim — for as legal sophisticates know, a party's "failure to attempt to meet the four-part burden under plain error review constitutes waiver." See United States v. Severino-Pacheco, 911 F.3d 14, 20 (1st Cir. 2018) (relying on Pabon, 819 F.3d at 33-34).

And that is that.

**Wrap Up**

Because appellants' challenges come to naught, we *affirm*.